Good afternoon. Judge Garth is joining us by video. Good afternoon, Leonard. Good afternoon, Judge Rundell and Nesky. We are pleased to have sitting with us today from the District Court, the Eastern District of Pennsylvania, Judge John Padova. We had a panel a couple months ago, and we can't seem to let go. We continued this argument, having gotten supplemental submissions, so we'll now hear argument in the case of UPMC St. Margaret v. Leavitt and UPMC Braddock Hospital v. Leavitt. Counsel? Thank you, Your Honors. May it please the Court, Samuel Braver on behalf of the appellants, and I have reserved two minutes of rebuttal time. I'm going to spend my time, most of my time dealing with UPMC Braddock. All right. Your Honors, there are five specific reasons why the Einstein, recent decision in Einstein of this Court of similar issues doesn't apply. There were five specific factors that the Einstein panel found to be critical, which were present in the statutory merger in the Einstein case, none of which are in the UPMC Braddock case, and all of which would indicate that what we do have, whether you call it a sale under the Secretary's approach or the statutory merger, which it was, Your Honors, we have a bona fide transaction of which you will, I hope to show in my argument, where there was consideration of fair market value of relatively equal dollars. Now, let me go back. The administrator only looked at the 13 million in land and depreciable assets that it seems now is conceded is really three and found that the numbers were so far apart. The administrator never really looked at the, never really probed the cash or current assets, nor did it really consider the foundation commitment and the value of those. Is that correct? That is correct to a point, Your Honor, although the district court judge in his affirmance addressed the issue and it's been briefed by both sides. And I'm going to show you, that is what you've, their acknowledgement of their 400% error in valuation, which is when they considered what we now concede is the fair market value of the physical property. Right, the 13 versus the three. Right, so now it's $10 million, which was a 400% error they've acknowledged. The other issue, which I will now address, goes to the foundation money, which they've indicated that, well, that was part of the transaction, that was their money. In the Einstein case, Your Honors, or the panel's decision there was when you have limited use funds, funds that are restricted, that are not the provider's funds, you can't count that because they don't have control, or as the Einstein panel said, you can't get your, it's not necessary cash. You can't do what you want to do with it. What we have here, and the record is very complete on it, is that these funds were under the control of the foundation. The foundation was not merged into UPMC Braddock. The foundation was a non-for-profit, independent board that what it did was make, in effect, a gratuitous promise. Same purpose, same mission. They supported the provider before the merger. They agreed to support it after. And the provision here, I'm looking at Appendix 592, talks about the distributions shall be at such time and in such manner as the foundation in its discretion determines. Sole discretion. Sole discretion, all right. So you would say that's restricted as per that agreement and, therefore, cannot be counted at $3 million. Cannot, should not, because the test would be whether or not the foundation, despite having made a representation that it would support the hospital, it was up to them whether or not, because it was in their discretion on requests made by UPMC Braddock, for them to decide whether they want it. So when you take what is now the $10 million of the year, the $3 million out of it, you have $13.2 million of assets made up of the $3 million. Mr. Braver. I'm sorry, Your Honor. Mr. Braver. Yes, sir. In Einstein, Judge Slaughter did state, as you did, but gave a $1 million discount off the grant and only credited the grant up to $1 million, exclusive of that $1 million. What do you propose we do with the foundation monies? We can't say that all $3 million of them are excluded, can we? Well, the answer, I believe, Your Honor, is you can and you should, because it is controlled by the foundation. It wasn't the new entity's money. If they made a reasonable request and it was honored, they would get it. Even under that consideration, let's assume that you discounted it, and I disagree with the Einstein's panel, but that decision is what it is. Even if you do that, what you then have is a relatively minor discrepancy in value. We have liabilities that was the consideration in return of $12.9 million-plus. Balance that against even if, let's say, you give it half of its value. You're at $13.4 million. It's basically dollar for dollar in a very ravaged, thin-market health care in Braddock. How would we determine, Mr. Braver, how much of that $3 million might be instrumental in this matter? Isn't it the sort of thing that we would normally send back to the district court and say, give us what the value of this is that we can add to the assets and then subtract the liabilities and see what the result is? Isn't that the appropriate way to handle it? That would be an approach, Judge Garth, that you obviously could do, but I don't think it would be the appropriate approach. The district court just bought into the argument. Magistrate Judge Mitchell just bought into the $3 million, didn't give any analysis. The administrator never questioned it. Here we have very clearly a $3 million issue of funds that belonged to the foundation. They didn't belong to the provider. So I don't believe that it would be a prudent use of the district court's time, nor do I believe that it would be the appropriate remedy here to send it back for the magistrate judge to make that decision. These funds very clearly are limited-use funds that did not belong to the provider. That could be an approach. What about the—oh, excuse me. Leonard, did you have a follow-up? Yes, I had one more question, Judge Rendell. If you're right, Mr. Braver, and that it would not be feasible or appropriate to remand it to the district court for that, and if you're also right, and I'm not suggesting that you are, that this court should hold that this is a bona fide transaction, wouldn't we be obliged in any event to remand this to the district court for the determination of relatedness? And if we did that, why shouldn't the district court tackle both jobs? Judge Garth, you're right that the district court did not deal with the related party issue. I believe that it is very—and you could send it back. I don't believe that it's necessary because as a matter of law, I believe that the law on related parties is very clear. We have a Tenth Circuit appellate court decision via Christie. But the law is—well, we have one circuit court decision, but it's diametrically opposed to the Secretary's interpretation. So I don't think we have much clarity here. Who should decide that issue? Should we decide it or should the district court decide it? Your Honor, I believe that you should decide it. The Secretary—it's been fully briefed. The issues are framed very clearly relative to the related party, which I can deal with right now, but there are two—let me just deal with— You have one other little hanging chad here on the first argument, which is the current assets, the $10 million. I'm assuming you're going to want to poke at that valuation as well. I will. What we have, the discrepancy between the values, when you take out the limited-use funds, $3 million, and you give the acknowledgment of their blatant error of the 10, we're down to 13.3 versus 12.9. So it's basically dollar for dollar. We don't have the large discrepancy, which was viewed to be a critical factor by the Einstein panel. We don't have the large discrepancy that's in the program memorandum of $2,000 that generated all of this interest. We have basically—you're down to—the Secretary can't have it both ways. They can't say that, well, we did make a 400% value loss. That's immaterial. And then to say that our difference between 13.3 and 12.9, which is an appraised value, a fair market value, that 400,000 is immaterial. How about the negotiation? I mean the test, the bona fide test, is not just valuation. It is also arm's length negotiated transaction. What is there in the record to support you on that? This record is filled with evidence supporting the fact that this was the best and only offer, which in Einstein the court found to be critical. And I'm going to give up my rebuttal time. We're going to let you go a little bit more. This is an important case. So why don't we add five minutes. Thank you. And we'll do the same for your colleagues. Thank you, Judge Randall. In the Einstein decision, what was viewed to be critical was that in Einstein, there was an offer passed up that would have provided almost $27 million of gain, tens of millions of dollars of gain. Gave that up, and that was a factor that was used to be substantial evidence supporting whether or not it was bona fide. We don't have that here. What we have is six years of history of going out, trying to set this up as a joint venture. It didn't work. Sent out seven RFPs, including one leading up to the one the UPMC stepped in. Nobody wanted to touch this hospital. And that's in the record. It's in the affidavit of Tom Boyle, which was stipulated. That's an accurate representation of history. So what you have is a hospital that doesn't have anything more than $13 million of assets at a fair market value, and you've got liabilities that need to be paid of $12.9 million. So you basically have dollar for dollar. You had independent legal advice. You had separate accounting, separate counsel, and this led to the only – it was the only offer on the table. That's arm's length. Nobody else wanted to touch this, and you've got somebody stepping up to say, we're going to take it on basically dollar for dollar. Mr. Braver. Yes, sir. I have another question. Our standard of review here is to defer to the Secretary. Is that not so? Your standard of review is to defer? Yes, if it is an issue where the regulations are clear and the – in this case, I take it that they've created an ambiguity. But, yes, you defer. All right. There's a reasonable interpretation. I think it's that there's a reasonable interpretation. Right. If the Secretary's interpretation is reasonable, we defer. Okay. Okay. Now, the Secretary has to have substantial evidence to support the conclusion that it reaches. Is that not so? That's the standard. What evidence did the Secretary have here to hold for the – against a bona fide obligation, a bona fide transaction? Was there any evidence? Insubstantial at best. I take the position, as set forth in our papers, that the entire program memorandum was nothing more than an effort to close a loophole that they didn't close back in 1996 when they changed the regulation. They do not want to pay out recapture loss. It's very clear. What they did was – No, I asked you – Mr. Graber, forgive me. I asked you what evidence the Secretary had on which we could say that there was substantial evidence which was reasonable to which we should defer. The Secretary first tried – I don't think they have substantial evidence that a reasonable mind would accept supporting it. They tried first to base it upon the large discrepancy, which they backed off of when they made the 400 percent error. They based it on what they thought was $3 million or considered $3 million foundation money as being a basis to show, well, there's a discrepancy. It wasn't the emerging entities' money. So those two were almost 420 percent of error and value. So they didn't have that. They tried to show that there wasn't any – they tried to base it on the fact, well, you didn't go out there and look for another taker. We had – that was insubstantial, and it wasn't supported in the record. We had seven RFPs that weren't accepted. We have an issue relative to whether – this was the only offer on the table. The issue is when the Secretary's interpretation, of which they didn't have a basis here, which they lacked substantial evidence, did the word spread? That's part of this arm's-length transaction. Well, the word spread. We took it on ourselves to go out and solicit RFPs. What we have here, Judge Garth, is a record as it relates to arm's-length transaction, dollar for dollar. The fact that the Secretary made a big point, and so did the district court, that there had been no appraisal made initially and before the transaction took place. There is no – that is not evidence of which they can relate to anything in the record or the regulations. There's no requirement that you need to have an appraisal before a transaction. What we did is we obtained an appraisal not beforehand, but we got one after. No issue relative raised as to whether or not the fair market values were in any way unreasonable or not supported. In fact, they accept the appraised value. So the Secretary on this record, as it relates to arm's-length transaction, the five Einstein factors that the Einstein panel of the Third Circuit found to be relevant, whether or not there was a discrepancy in the valuation, whether or not you left offers on the table, whether or not you structured this in order to gain recapture, whether or not you acted in the best interest of the merged entity, none of those are present on this record. So I would submit, and I'm arguing, Judge Garth, that the Secretary abused its discretion, the district court abused its discretion. There is no substantial evidence in this record on which they can support a bona fide arm's-length transaction of which a reasonable mind would accept. It doesn't exist. If we go to the related parties. Why is the relatedness issue, why is their interpretation unreasonable? The interpretation is unreasonable for at least three reasons. If you look at what was the regulation that they're relying on, this is the A0076, which is very clearly set forth in the record. They give you two examples. Let's assume for purpose. What's the language itself of the regulation? The language says this, and we're looking at whether or not there's significant control and influence. It says the term significant as used in this program memorandum has the same meaning as the term significant or significantly in the regulations. Was there a significant relationship such that you could exert influence or control or be controlled by the other entity? But you're arguing that it's a before relatedness, aren't you? I'm arguing it's before, but no question. The language is very clear. It says whether the parties were related that went into the transaction. Via Christi, it was the Tenth Circuit case, says it best, but I'm not saying anything different. So you're saying, and let's use A and B. We've got A and B that merge to become C. You're arguing that A and B have to be unrelated. Well, A and B, you look at whether A and B are related at the time of the merger. But even assuming that they're right, that it's A and C or B and C, you're saying there was no control? That's correct. So even under their interpretation. Even under their interpretation, there's no substantial evidence. The two examples that they give in the program memorandum that the Secretary relies on, four years after this transaction, which in and of itself is unreasonable. But four years after the transaction, this is why I go back to say when they tried to change the Balanced Budget Act of 1996 to basically take away recapture, which is fine. Congress can do that. They missed this issue, so now they come back in 2000 when they see that all these recapture losses. The regulation says that you can have a statutory merger, and you look to the state law whether or not the merger is appropriate. Well, you can't have an emergent situation after the merger takes place, and there isn't any issue. In fact, they stipulated that it was appropriate under Pennsylvania law. Speaking on the mic, please. I'm sorry. I'm sorry. You can't have a merger under Pennsylvania law or any state's law, but Pennsylvania is the key one here, where the entity that merged into still exists. It's gone. It evaporated. It can't control anything. So what they did was, as I say, it's part of the facade. They came up with this test. Well, if you have carryover, then you have this continuity. It's almost as if you have some kind of foreign people coming in, taking over the corporation once it's merged. Well, CMS, I mean, intellectually you can't get there. Metaphysically, you might be able to get there. All right. We'll hear from you on rebuttal. Okay. Judge Gordon, do you have another question? I have one more question. Okay. Yeah. On the relatedness issue, are there not facts as to the affiliations, as to the inclinations, as to the actions that the board of directors had taken which would bear upon whether or not there was a relatedness factor? And as I understand it, both the bona fide transaction and the relatedness must be satisfied in order for you to succeed. Am I correct? That's correct. Yeah. Well, shouldn't the district court be the one to determine what the effect of the board of directors was, whether or not there was a relatedness factor that was present? No, for this reason. We only had six carryover directors go from the old entity, that of 18. Even if they voted as a block, they controlled nothing. We have a record that there is absolutely no evidence. And we put it in that these directors negotiated at arm's length. For this court to send it back, it is so clear in this record that there is no evidence of they put nothing in. Presumably, I was going to say, they had their shot at putting in whatever evidence there would be. I would assume we wouldn't have the district court take more evidence. No, it would be inappropriate, I think, to take new evidence because the district court has to deal with the record that exists when it comes up. From the administrator. And they put in nothing. There is no evidence that they put in other than their position paper. Their program memorandum that they rely on for relatedness, and this is why I would not send it back, provides two examples. Example one, where 50% of the members come over, and they have 50% control. You can make the argument that might be reasonable. Or they have another one where there is almost 48%. We only have one-third, and you've got to make the jump in intellectual reasoning, that each one of these directors, even though they couldn't control anything, to an independent organization to say, I don't care about your new entity. I'm going to vote and consider my former corporation that doesn't exist anymore. There's nothing on this record to consider. Judge Garth, anything further? No, Judge. All right, thank you. We'll hear from you on rebuttal, Mr. Braver. Thank you. It's up to your co-counsel. Okay. May it please the Court. I'd like to begin with a question that Judge Garth Just state your name, please. I apologize. Joel McElvain for the appellee. I'd like to begin with the question that Judge Garth asked a few months ago, which was what was the evidence for the bona fide sale finding of the administrator. And I'll focus most of my argument on Braddock, just as appellant's counsel did, although, of course, I'm available for questions in either case. There's ample evidence in the record that there was no bona fide sale of the Braddock assets. And to take a step back for a moment, the question is, the standard, of course, is substantial evidence, but the question is substantial evidence for what? And that is substantial evidence for the legal standard, which is, was there an arm's-length transaction in which the parties were attempting to negotiate reasonable consideration and in which reasonable consideration actually was exchanged? That's the Einstein case. That's Program Memorandum 8-76. Okay. And what's in the record to support your position that there were no arm's-length negotiations? We have Mr. Boyle saying that they had legal counsel, extensive contract negotiations took place leading up to the merger agreement and merger. We have the RFPs. What is there to support your view that this did not occur? Extensive contract negotiations, but negotiations over what? They were negotiating over the staffing of the board, the division of the board. Is that in the record, that the negotiations were not of the kind that should matter here? There is absolutely no indication that they were negotiating over compensation. Do you have appendix references to tell us where in the record? Well, it's, on this specific point, it's a negative point. They say there were extensive negotiations, but then the sentence ends. There were extensive negotiations, period. But then if you look at what the negotiations actually were. Well, but I'm saying, where in the record? But they're not claiming that there were negotiations over price. In fact, I suppose you could ask appellant's counsel, but I think that you would concede. Well, I don't think the regulations say the negotiations have to be over price. They say that it's arm's-length with negotiations and ending up with a fair equivalent value. No, arm's-length negotiations where you're attempting to get reasonable consideration. And if you're not motivated to get reasonable compensation. You're reading something into this that isn't apparent to me. I guess I'm asking you, where in the record does it say that, although there were extensive contract negotiations, they had nothing to do with price? Their motivation was not to seek reasonable compensation. It was to continue the hospital's mission. That's at page 237 of the appendix. Wait, wait, wait. Okay, I have 237 of the appendix. There's paragraphs on there. This is Boyle's affidavit 230. Paragraph 21 describes the motivations of the parties and says that the merger would enable them to achieve their charitable purposes, allow them to develop enhanced clinical capabilities, permit an efficient and cost-effective rationalization of health care services, restrain increases in the cost of services, and support increased managed care opportunities. But there's no mention there of a motive to seek a fair price. Well, that doesn't say what their goal was in the merger. It doesn't say what the negotiations were about. Right, but it was the providers burdened before the administrators who put forth evidence that they were seeking a bona fide sale, and they put forth absolutely no evidence that they were seeking an exchange of a fair price whatsoever. As further evidence of that, they didn't seek an appraisal before the merger. You would think if somebody really was trying to divorce themselves of their assets, put them out to the world, get rid of them, and get a price back. Well, you might be afraid of what it comes up with. I mean, they had hardly any cash. They had receivables, you know, $5.3 million in receivables. Somebody might have come in and said they're worth nothing. The receiving party, I apologize, I interrupted you. You really want to see what somebody's going to pay, and when you get, you know, a willingness for somebody to assume your liabilities, and you look at your balance sheet and you say, you know, my assets, might not support them if we had an appraisal. I mean. But you would think that the receiving party would be interested in finding out what they're buying, too. Neither the buying party or the selling party, supposed buying party, supposed selling party, showed any interest in what the actual value of what was being exchanged. Well, if the receiving party says we're going to pay $12.9 million in liabilities, I'm assuming they're going to think that they're getting something. I don't know. I would assume exactly the opposite since they're giving up $13.3 million in cash assets, which means they're getting nothing for their non-cash assets. And that goes. Well, wait. Mr. McElvain. Yes, sir. Isn't this a vastly different situation than the one in Einstein where that was made very patent, that they were seeking to get a Medicare deduction in Einstein, whereas here Braddock wanted just to have credibility in the health field? I don't. There was nothing said about. There was nothing that was ever announced or expressed with respect to the very loss that they're seeking. To be clear, we don't think that the merger itself was a bad faith transaction. We don't dispute that they had a good reason to merge and to continue on with their mission in a new form. So that's not the question. We're not saying it's a sham transaction in any form. But the relevant question is, it was not the sort of transaction that allows you to calculate the value of the assets that were supposedly exchanged and therefore allows you to recalculate the depreciation that they might be owed. So even though. Well, is it your position that there must be an exact equation between the assets that are sold and the liabilities that are assumed so that in each instance, in this instance here, there would have been 13 million of the assets sold and 13 million of the liabilities that were assumed by the surviving corporation? Is that your position? I don't contend that there has to be an exact match, but there has to be one factor in looking as to whether there was in fact an attempt to gain reasonable consideration is, was there in fact reasonable consideration? Well, now there's $400,000, as I figure it, between the assets sold and the liabilities assumed. That's without taking into account the foundation's discretionary fund. Am I correct in that, sir? I would disagree with the characterization of discretionary fund, and I'd like to speak more to that in a second. No, but what about the $400,000? Let's take one thing at a time. Certainly. Is there approximately a $400,000 difference? 400%, I think you mean, Leonard. 400%? Or is it $400,000? I believe he means $400,000. I think it was $400,000. $400,000. And does that disqualify this from being a bona fide transaction, if that's what we had? Now, I realize there's a 500-pound elephant out in the woods there, which is the $3 million foundation grant. I don't want to deal with that at the moment. Does the $400,000 difference make this a non-bona fide transaction? Yes, and here's why. They gave up $13.3 million. Wait a minute, I didn't hear you. Yes or no? Yes, that difference makes it a non-bona fide sale. Not a non-bona fide transaction, but a non-bona fide sale. And here is why. Okay. They gave up $13.3 million in monetary assets, including the foundation funds, and we'll speak more about that. In supposed exchange for giving up the $13.3 million in monetary assets, their supposed consideration for that was also giving up $12.9 million in liabilities. So they're behind the game just if you look at the cash alone. So once you realize that point, the value of the non-monetary assets, whether it's $3 million or $13 million or any other figure, is simply irrelevant. Whatever the later appraisal might come up for that, they didn't know the value at the time. Whatever a later appraisal might come up with a figure for those numbers at some later point in time is irrelevant. And the support for that is Program Memorandum A-76 itself, which directly tells you that if you've given up more in cash than you've gained in the supposed consideration of giving up your liabilities, that in and of itself is conclusive proof that you do not have a bona fide sale. That's the equivalent of giving up your other assets, whatever they are, for zero. And giving them up for zero is not a sale. It's a donation. And the regulations are very clear that donations do not result in a readjustment of your depreciation of your Medicare. Mr. McAuliffe, earlier you told the panel that it did not have to be an exact equation between the assets sold and the liabilities assumed. Correct. I asked you whether the $400,000 difference here was material in determining whether this was an arms length or bona fide transaction. You said that $400,000 is enough to throw it over into one that is not bona fide. What is the difference that you espouse here, that you advocate here, for not equating the two and for determining what the results should be as to a bona fide obligation? Because that $400,000 difference is just the difference comparing money against money. It's before you even get to the depreciable assets. You don't know the value of those depreciable assets at the time of the merger because you haven't had an appraisal at the time. You're just guessing that some figure may come up later. So when I said that there doesn't have to be an exact equivalence, perhaps if I could provide an example, a very different case from the kind of case here, where you had two parties that really were negotiating over price and really were operating at arms length, and the selling party really was going to divorce itself from the management of the hospital after the fact, and all those facts are in place. And they negotiate and they arrive at a figure of, say, $90 million that a later appraisal might show was $95 million or something like that. The fact that there's a minor difference in that appraisal, in that circumstance where there really were negotiations over price, wouldn't defeat the fact that there was a bona fide sale. Your percentage here, 13.3, 12.9, is not different from your 90 versus 95. And now you're getting down to, you're not talking about value, you're talking about negotiation. I am talking about negotiation. That's a very central point. So your answer before as to the $400,000, that it automatically makes it non-bona fide, makes no sense based on what you just said. No, and I'm not being clear. When I'm talking about 90 million versus 95, that's the value of everything that's exchanged, cash and depreciable assets and land and everything. So I wasn't being clear in my example. The reason that the 13.3 million to 12.9 million is relevant is because that's just cash to cash before you even look at the depreciable assets. And Program Memorandum A-76 is very clear about how you go about the calculations. First you compare cash to cash. And if you've given up more in cash, then you've gotten back in surrendering the liability. How much did they get in cash? How much did? 2.328, correct? Well, cash assets, monetary assets, current assets. Cash, you said cash. I was using a shorthand. Cash is cash. I was using a shorthand. Current assets in Program Memorandum is very clear that you compare current assets to liabilities first. If 10.3 million is made up of 5.3 in receivables, prepaids, workers' compensation, capital assets, I mean, when you look at it. And I assume you're looking at page 243 of the appendix? I am. That is what the provider represented was the fair market value of all of those current assets. So that's the value, 10.3 million plus the $3 million of the foundation, which perhaps I should address now if the court is so inclined. The $3 million value of the foundation commitment, the provider contends is entirely discretionary, is worth nothing. That's just squarely belied by the record. And the administrator directly addressed this in the administrator's opinion. Where in the record? Give me an appendix site to what says it is not just discretionary. Pages 591 and 92 of the appendix, page 597 of the appendix. 592 at the end of section 1.1 says, distributions at such time and such manner shall support the activities as the foundation in its discretion shall determine. Right. And then you combine that with page 597 of the appendix, which says, section 6.2, notwithstanding the foregoing and without the necessity of obtaining the authority, consent, or approval of any court, the foundation may amend the terms of this agreement with respect to the administration, et cetera, et cetera. Provided, however, that this section 6.2 shall not be construed as authorizing any amendment whereby any parts of the fund's assets may be diverted from the purposes set forth in article 1. They're not diverted. Right. They can't divert them, but it doesn't mean they have to pay them out. So the only thing the foundation can do is pay out or invest for a later payout. Pay out or not pay out. But there's no third option. They either have to pay out at some later point after they've invested it. Well, if they pay out in 25 years, it may be worth nothing today. So the present value of the $3 million might be $600,000. How do we know? Well, what you know is what the parties thought at the time of the transaction, and the present value of $3 million is $3 million. They may do fantastically in the market. They may do poorly in the market. How can you say that, McIlvain? That was a purely discretionary foundation. Judge Rendell has just indicated perhaps they held onto it and did not pay out for 25 years. How can you say that this is an immediate available asset? I don't understand that. It was not a purely discretionary fund. They had two options, either pay out or invest, and then the later investment proceeds could be paid out. What part is not discretionary, Mr. McIlvain? Well, what's discretionary is that ultimately the assets have to be used for the benefit of the hospital. So the timing is up to the foundation, but that the ultimate use ultimately has to go to the hospital. So whether it's used now or used later, the present value at the time of the merger in either case is going to be $3 million. To put it another way, in a very different case, the provider could have come forward and said the actual fair market value was something different from $3 million. They didn't. All they said was it's an entirely discretionary fund, which is just squarely wrong when you look at the record. So it was their burden to say that the value was something different from $3 million, and they just didn't attempt to meet that burden. Can you touch on the relatedness issue? Quite frankly, I don't understand the Secretary's interpretation. To my mind, it eliminates mergers from qualifying for this deduction because it requires an abdication of control by the emerging entities, and that's just unrealistic. Tell me how it works, first of all, with the language of the regulation saying that it has to be between. Isn't the language it has to be between unrelated parties? Right. And does that mean that if a merger is between A and B, then how can we say that we look at anything other than whether A and B are related? If A and B merge, if A merges into B, and as part of the merger A assumes some significant control over B, then you have A on both sides of the transaction, and that's a related party. Well, but A and B end up becoming C. That would be a consolidation. Isn't the whole idea that if it's a sham that they're related and they're doing this just for that purpose, that you want to look at whether A and B are related because that would indicate sham? No, very definitely not. It's not just the question of whether it's purely a sham. It's whether or not there's some significant continued control, which doesn't have to be a sham. Show me a merger where there isn't. I don't get it. There are plenty of mergers. It's more common in the for-profit context. But imagine this. Imagine this in this context. You had the parent, Heritage Health Foundation. Suppose Heritage Health Foundation had two hospitals, Braddock and Alpha Hospital, and they decide in their best interest, we want money to continue to operate Alpha Hospital, and the way to do that is we just have to sell Braddock Hospital and let it go its own way and disappear. So they structure that as a merger with UPMC or whoever in a real exchange where the hospital is sent on its way, there's no continued control, and they get a real consideration, real money in exchange which they will now then devote to the other hospitals that they control. It happens very frequently in the for-profit context. The difference between a sale and a merger and a consolidation is often one just of form when you're talking about for-profit entities engaging in complex transactions. So it does happen with relative frequency that there will be a true divorce of control when the party merges. Divorce of control from the parent, you're saying. You're talking about Braddock and UPMC merging. Are they related before this merger? Are they related to each other? Are they related to each other before this merger occurred? They became related at the time of the merger. But the merger between related entities, doesn't that mean that at the time they merge, the two have to be unrelated, and weren't they unrelated? They were unrelated before at the time of the merger they were related because there was this contemplation of continued control. What does between mean? Between related parties. Between A and B. So the question is, are A and B related? And they weren't? No, they were. They were related at the time of the merger. They became after the merger. No, at the time of the merger. I don't want to argue with you, but I'm arguing. UPMC Braddock was not even in existence. UPMC Braddock was created to be the receptacle of the transfer. It wasn't even in existence. It was created before the merger by UPMC. And so it was a shell corporation. It was only after the merger it was related. No, at the time of the merger they were related. What was the relationship? I'm sorry? It was related in what respect? They were related in that they had a right of continued participation on the board, but not only that. Also, the foundation had the right to be consulted on fundamental changes, and for an interim period they actually had veto power over those fundamental changes. Third, the medical staff continued unchanged, and the structure of the hospital was that the medical staff also had significant managerial powers. They had the power to set the bylaws, for example. The sole member of each entity was different. The sole member was different, yes. But it doesn't have to be a complete total identity of the relationship before and after. It has to be a significant continued power of control, not a total identity. I do want to return to the question of whether or not there was. Have you added five minutes for him? You did? So the red light means with the five minutes? Yes. Okay. Leonard, did you have further questions? No, ma'am. All right. You would sum up, please, Mr. McElvain. Okay. Just very briefly since I'm out of time, on the question of whether it has to be related at the time or related before, that question is answered by 413.134L22, which talks about a relationship that's created actually at the closing table of the transaction and says that's a related party issue. So the regulation itself answers that question. So for both because it's a bona fide sale and because it's a related party, not a bona fide sale and because it's a related party transaction, the administrator's decision should be affirmed. Thank you. Thank you. Mr. Graber, we'll add you two minutes. I think I will take less. Just a couple of points. The U.P. and Judge Padova, you're right. There was a receptacle set up. You've got to have something go into something. You have to open up your doors. Then the suggestion that we, the medical staff, it's a hospital. Even change in administration or presidential election, federal governments just don't get rid of everybody. The president comes in, people take their jobs. Some people don't. Everybody didn't take a job here, but that's not the issue. We did not give up, as was suggested, the hospital for nothing. $13.3 million, 2.3 in cash, $12.9 million. Basically, $2.9 million we got for the hospital. There's only a $400,000 difference. This was the administrator. Counsel was talking about another category of assets that was not included in the $13.3 million. He was talking about appreciable assets that you got over and above $13.3 million. At least that's what I understood him to say. The document that Judge Rendell was looking at, which has all of our assets, there was the cash and non-monetary assets, which also included the accounts receivable, which accounts receivable may have, although it said $5.2 million, they might have been more, who knows when I collected it. But in any event, the total of the cash and the workman's comp and the AR came to something like $10.2 million. Then you have a $3 million physical asset. That's $13.1, $13.2. You can give them $13.3 against $12.9 million, $10,000. So it's basically dollar for dollar. There was no issue with respect to it. I think you are correct. The way this program memorandum was set up was to make sure that there would never be a payout on a recapture. That's what, when I went back to say what they didn't do in 1996 when Congress properly changed the law, they went back and said, oh, my God, we're going to have recapture. They had no problems with these regulations when there were gains and there was more money coming back into Medicare. There is clearly no relationship before. We only had six directors go on to a board of 18. Their own example in the program memorandum that they say, this is it, this is the gospel, talks about 50%. Even if we voted in a block and disregarded every fiduciary duty that would be imposed, the duty of care, the duty of loyalty, there's no control. Thank you very much. Thank you, Counsel. The case was well argued. Leonard, do you need a transcript? I was just going to ask you whether the parties could provide us with a transcript of the argument. You can see the clerk and make arrangements. You can split the cost, if you would, of a transcript of this argument. We'd appreciate it. It's an important case. Thank you very much. And we will ask that the courtroom be cleared. Leonard, if you just want to stay there, you want to confer now? Yes, I'd like to. Take your time, gentlemen.